Adam W. Hansen (State Bar No. 264241)
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401
Email: adam@apollo-law.com
Phone: (612) 927-2969

Nicholas D. Thompson
CASEY JONES LAW
323 N Washington Ave
Ste 200
Minneapolis, MN 55401
Phone: (757) 477-0991
Email: nthompson@caseyjones.law
(*admission pro hac vice forthcoming*)

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Josh Vandermeulen and Jon Caraway, *individually and on behalf of the proposed class*,<br>Plaintiffs,<br>vs.<br>BNSF Railway Co.,<br>Defendant. | Case No.: 25-3274<br>**FIRST AMENDED COMPLAINT**<br>1. Violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*<br>JURY TRIAL DEMANDED |

## INTRODUCTION

1. The Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the California Family Rights Act, Cal. Gov't Code § 12945.1 *et seq.* ("CFRA"), grant

eligible employees the right to take up to 12 workweeks of leave a year to care for sick family members, bond with newborn children, and tend to their own serious medical conditions. 29 U.S.C. § 2612(a)(1); Cal. Gov. Code § 12945.2(a). The FMLA and CFRA likewise prohibit employers from "interfer[ing] with…the exercise of…any right provided [by the FMLA and CFRA]." 29 U.S.C. § 2615(a)(1); *see also* Cal. Gov. Code § 12945.2(q). This case is about an employer, Defendant BNSF Railway Co. ("BNSF"), that systematically deprives its employees of their FMLA and CFRA leave by (1) grossly miscalculating the amount of FMLA and CFRA leave available to employees and (2) punishing employees who take FMLA and CFRA leave through discipline, docked pay, and lost opportunities for work. Plaintiffs, current and former BNSF employees who rely on the protections of the FMLA and CFRA, bring this class action to put a stop to BNSF's unlawful conduct.

## PARTIES

2. Plaintiff Josh Vandermeulen was a train conductor who worked for BNSF for 11 years. Vandermeulen worked for BNSF based out of BNSF's train yard in Needles, California. Vandermeulen regularly conducted trains to and from Los Angeles, Bakersfield, San Bernardino, and Barstow, California.

3. Plaintiff Jon Caraway is a train engineer who has worked for BNSF for 14 years. Caraway works for BNSF based out of BNSF's train yard in Winslow, Arizona. Caraway regularly drives trains to and from Needles, California.

4. Defendant BNSF is one of six Class I railroads—the largest freight rail operators in the United States. BNSF provides freight rail transportation services across much of the western two-thirds of the United States, including in California.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over this lawsuit under 28 U.S.C. § 1331.

6. Venue is proper under 28 U.S.C. § 1391 because the illegal conduct occurred in this district. Venue is proper in the Eastern Division because Plaintiffs work at and around the BNSF terminal located in Needles, California, in San Bernardino County.

## FACTUAL ALLEGATIONS

7. This case requires a basic understanding of BNSF's on-call work system. BNSF is one of the largest railroads in the United States. It operates 24 hours a day, 7 days a week, 365 days a year. That means BNSF's employees may be called to perform work at any time of day (or night) on any day of the year.

8. Plaintiffs and members of the proposed class work on trains as conductors and engineers, and in other similar positions. BNSF calls these employees "Train, Yard, and Engine" or "TYE" employees.

9. BNSF's TYE employees overwhelmingly work on an on-call basis. BNSF uses a crew management software system called the "Workforce System" to staff its trains. Exhibit A at 4. Broadly speaking, within the crew management system, employees are

either "marked up"—meaning they are available for work—or "marked off"—meaning they are unavailable for work.

10. An employee who is marked up is placed on a list of marked-up employees. Some lists are called "pool boards." Employees assigned to pool boards typically take a train on a predetermined route—for example, from Needles, California to Winslow, Arizona and then back again. Some lists are called "extra boards." Employees assigned to extra boards work on various routes on an as-needed basis. But the process for assigning work is the same for both kinds of boards. As work becomes available, the employee who is marked up and at the top of the list receives a notification from BNSF that he is to report to work. These notifications can come at any time: during the day or night; during the week, on weekends, or on holidays. When employees receive these notifications, they must report for duty within two hours. Failing to do so results in serious discipline and can lead to termination. After the work is complete and the employee is eligible to mark up again, he is added to the bottom of the list. Employees who are marked up therefore move up the list until they are eventually called into work.

11. Employees mark off, making them unavailable for work, for a variety of reasons. To mark off, an employee typically logs into BNSF's Workforce System and marks off. BNSF tracks the reason for the mark off through a system of codes. A document listing these codes (and translating them into English) is attached as Exhibit B. Some common codes

include “FEM” (family emergency), “FML,” (FMLA leave), “LAB” (leave of absence), “LOS” (layoff sick), and “VAC” (vacation).

12. Employees may also mark off to take FMLA leave, if eligible to do so. FMLA leave comes in many shapes and sizes. Employees mark off for anticipated events, like the birth or adoption of a child or a planned medical procedure. Some employees mark off intermittently—for example, when they need regular medical treatment or experience an acute period of illness from a pre-existing condition. And, of course, employees take FMLA leave from time to time to deal with unanticipated medical emergencies.

13. When employees mark off for FMLA leave, they are removed from the on-call list. Once the period of FMLA leave is over, employees are marked back up and placed at the bottom of the on-call list. In this way, employees who use FMLA leave effectively lose their place in line. This policy of moving employees who take FMLA leave to the bottom of the on-call list has an actual and substantial effect of reducing the hours of work—and thus the take-home pay—for employees who take FMLA leave.

***BNSF Miscalculates The Amount of FMLA Leave Available to Employees***

14. The first issue in this case involves the manner in which BNSF calculates and depletes employees’ FMLA entitlement. That issue reduces down to a single overarching question: When a BNSF employee needs to mark off, removing himself from BNSF’s on-call system, for a period of ***X hours*** to take FMLA leave, how many ***workweeks*** of FMLA leave (out of the total statutory annual allotment of 12 weeks) does he use?

15. The FMLA and Department of Labor regulations provide the answer. *See generally* 29 U.S.C. § 2612(a)(1); 29 C.F.R. § 825.205. Because Plaintiffs and class members work variable and irregular schedules, BNSF must base their FMLA-leave entitlement—i.e., the total amount of FMLA leave employees are entitled to—on the amount of time in the prior year that they worked *plus* the amount of time that they *would have worked* during that period but for taking leave of any type. *See* 29 C.F.R. § 825.205(b)(3) (directing employers to derive employees' leave entitlement based on "a weekly average of the hours scheduled over the 12 months prior to the beginning of the leave period (*including any hours for which the employee took leave of any type*)" (emphasis added)). In other words, when determining how much FMLA leave each Plaintiff and class member should receive, BNSF must base the employee's leave entitlement on two things: the amount of time in the prior year the employee worked *and* the amount of work time the employee missed because of taking leave during that period. *Id.*

16. The FMLA also instructs employers how to calculate how much FMLA leave an employee uses—i.e., the amount of time to deduct from that employee's total FMLA-leave allowance when he takes leave. To begin with, BNSF may not require employees to take more FMLA leave than necessary, and it must let employees take FMLA leave in increments of no more than one hour. 29 C.F.R. § 825.205(a)(1). In addition, BNSF must count employees as using an amount of FMLA leave in direct proportion to the amount of work they miss because of leave in each workweek—with each employee's standard

workweek providing the baseline to measure this. *Id.* § 825.205(b)(1), (c). Time that an employee would not have been working may not be counted as FMLA leave. "[O]nly the amount of leave actually taken may be counted toward the employee's leave entitlement." *Id.* § 825.205(b)(1). Were it otherwise, BNSF could end up reducing the employee's FMLA leave entitlement "beyond the amount of leave actually taken." 29 U.S.C. § 2612(b)(1); *see* 29 C.F.R. § 825.205(b)(1). When an employee who works variable hours takes FMLA leave, the amount of leave that employee takes may be calculated either as a fraction of that employee's workweek or as its hourly equivalent. 29 C.F.R. § 825.205(b)(1). But if that fraction is converted into hours, the conversion must "equitably reflect[] the employee's total normally scheduled hours." *Id.*

17. In early 2022, BNSF completely revamped its method of calculating FMLA leave. BNSF's new methodology badly miscalculates both the amount of FMLA leave available to eligible employees and the amount of leave taken by those employees. BNSF's methodology is faulty in several ways. But, at bottom, BNSF's leave-calculation methodology *undercounts* the amount of leave employees have available to them and *overcharges* employees for the leave they take. This undercounting and overcharging leads to an obvious—and unlawful—result: BNSF claims that employees have exhausted their FMLA leave long before they have in fact done so.

18. Here is what BNSF does. First, BNSF calculates the total amount of FMLA leave to which it claims that employee is entitled. BNSF does this by determining what it claims is

the number of hours the employee actually worked in the prior year. BNSF then divides this number by 52 (for 52 weeks) and multiplies it by 12 (for 12 weeks of FMLA entitlement). This calculation is meant to determine the amount of time the employee worked, on average, in any given 12-week period in the prior year. The resulting number represents BNSF's determination of the total amount of FMLA leave that the employee has available.

19. Second, after calculating an employee's total FMLA-leave allowance, BNSF determines the amount of leave that an employee uses up when he marks off for FMLA leave. BNSF does this—and this is the critical step—by depleting the total hours of FMLA leave available to the employee by *the total amount of working time that it takes for any train the employee missed to complete a round-trip voyage*—a trip that can last multiple days. That remains true even if the period of leave has ended and other trains are available to work on—indeed, it remains true even if the employee who took leave has actually resumed working. Once employees' allotted hours are completely depleted, BNSF does not allow them to take additional FMLA leave.

20. BNSF's methodology for calculating FMLA leave is both wrong and illegal, for at least three reasons. *First*, by determining the number of hours available for FMLA leave by reference to employees' *actual hours worked*, but depleting that leave entitlement using employees' *total work time on a train's round-trip voyage*, BNSF provides employees with only a fraction of their 12 weeks of statutory leave. BNSF does this through an unfair

apples-to-oranges calculation methodology. If an employee works, on average, six hours a day—or 42 hours a week—then an employee who marks off for a single 24-hour period misses, on average, six hours of work. But BNSF charges an employee who marks off for a single 24-hour period with missing far more than six hours of work. A train may run for 20 hours or more to complete a round-trip journey. BNSF therefore might charge an employee who misses a single 24-hour period with missing nearly *half a week of work* (20 / 42).

21. The company overcharges employees for the leave employees take in a *second* way, too. The FMLA and its implementing regulations require employers to allow employees to use FMLA leave in the smallest increment of time the employer allows for other forms of leave—such as vacation time—as long as that increment is no longer than one hour. *See* 29 C.F.R. § 825.205(a). The basic point of this rule is straightforward: employers may not require employees who need FMLA leave to take more FMLA leave than necessary. *Id.*

22. BNSF does not comply with this rule. It does not allow employees to take FMLA leave in increments of one hour. And BNSF often forces employees to mark off for far more FMLA leave than they need. BNSF generally requires employees to initially mark off for a minimum of 12 hours. When BNSF's unlawful practice of forcing employees to take more leave than they need is combined with its policy of calculating employees' FMLA leave by reference to the total round-trip train hours they mark off for that leave,

these policies and practices work together to rapidly—and unlawfully—deplete the hours of FMLA leave available to employees.

23. *Third*, BNSF fails to allot all the leave that employees are entitled to receive by failing to account for prior periods of leave. Recall that employers must base employees' FMLA-leave entitlement on the amount of time in the prior year that employees actually worked *plus* the amount of time that they *would have worked* but for taking leave of any type. *See* 29 C.F.R. § 825.205(b)(1), (3). These regulations ensure that an employer's calculation of an employee's FMLA-leave allowance is based on the equivalent of a *standard week of work* (i.e., a week where no leave is taken), as opposed to a week diluted by various forms of leave that employee took over the prior year. To do otherwise would reduce the amount of leave to which that employee is entitled.

24. If this feels abstract, think of it this way: a 40-hour-a-week employee who misses a single eight-hour shift uses 0.2 weeks of FMLA leave because that employee works five eight-hour shifts in a standard workweek. That remains true even if this same employee took four weeks of vacation, two weeks of sick leave, and two weeks of FMLA leave in the prior year. Failing to account for work that was missed during those eight weeks of leave for purposes of determining that employee's FMLA-leave allowance would yield the mistaken conclusion that a single missed 8-hour shift counts as 0.24 weeks of leave, not

0.2 weeks.[1] The FMLA ensures that this does not happen. And it does so by requiring employers to include both the hours an employee works and the amount of work an employee missed because of leave that employee has taken when calculating that employee's FMLA-leave entitlement.

25. BNSF shortchanges employees when it allocates employees' total available FMLA leave. In determining the total number of hours of leave available for employees, BNSF looks exclusively to the total number of hours each employee allegedly worked in the prior year. BNSF does not include hours that employees would have worked but for taking leave of any type. In other words, BNSF does not account for any hours of leave—FMLA or otherwise—that employees took during the prior year when determining how much FMLA leave employees are entitled to.

26. Once BNSF deems employees to have exhausted their allotment of FMLA leave, employees are forced to take unprotected leave, which exposes employees to negative attendance points, suspension, and termination.

27. BNSF uses a formulaic attendance policy and points system called Hi-Viz. *See* Exhibit A. All employees begin with 30 points. Exhibit A, Hi-Viz FAQs at 4. BNSF then subtracts points for various attendance infractions. For example, simply marking off—

[1] An employee who customarily works 40 hours a week when not on leave but who misses 8 weeks of work works approximately 33.8 hours per week if the leave periods are included when calculating the employee's average weekly hours ((44 x 40) / 52). Eight hours (the number of hours missed from a single day of FMLA leave in the hypothetical above) divided by 33.8 equals approximately .24.

making an employee unavailable for work—for 24 hours usually results in a loss of seven points. *Id.*, Attendance Guidelines at 1. The first time an employee exhausts his points, he is subject to a 10-day suspension. *Id.* at 3. The employee is then given 15 new points. *Id.*, Hi-Viz FAQs at 4. The second time an employee exhausts his points, he is subject to a 20-day suspension. *Id.*, Attendance Guidelines at 3. The employee is again given 15 new points. *Id.*, Hi-Viz FAQs at 4. The third time an employee exhausts his points, he is subject to dismissal. *Id.*, Attendance Guidelines at 3.

28. Once BNSF deems an employee to have exhausted his FMLA leave, employees who need to mark off have no choice but to use unprotected leave, resulting in negative points assessments under the Hi-Viz policy. And once employees' points are exhausted, they are subject to discipline and termination.

29. Since BNSF shortchanges employees on the amount of FMLA leave available to them, BNSF is effectively punishing employees for leave that should have been protected by the FMLA.

***BNSF Punishes Employees Who Rely on The FMLA***

30. In addition to miscalculating the amount of FMLA leave available to its employees, BNSF also punishes employees who take FMLA leave. BNSF does so in five ways.

31. *First*, when employees mark off for FMLA leave, they are removed from the on-call list. Once the period of FMLA leave is over, employees are marked back up and placed at the bottom of the on-call list. *Id.* In this way, employees who use FMLA leave effectively

lose their place in the on-call line. *Id.* This policy of moving employees who take FMLA leave to the bottom of the on-call list has the effect of substantially reducing the hours of work—and thus the take-home pay—for employees who take FMLA leave. *Id.* BNSF's practice of failing to maintain employees' position on the on-call lists violates the FMLA, which requires that employees who take FMLA leave (1) "be restored...to the position of employment held by the employee when the leave commenced," or (2) "be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment," 29 U.S.C. § 2614(a), and that the taking of FMLA leave "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Id.* § 2612(a)(2).

32. *Second*, BNSF penalizes, disciplines, and terminates employees who use FMLA through a "Conjunction Penalty"—negative attendance points that are assessed when employees take FMLA leave within 24 or 48 hours of other forms of leave. Exhibit A at 1. Under the Hi-Viz policy, if a train conductor comes down with a cold and marks off sick for work for one day, BNSF deducts seven attendance points from that employee's bank of points. *Id.* However, if that same sick day falls within 48 hours of the employee's FMLA leave (say, to care for a child with a chronic health condition), BNSF deducts an additional *three points*—the Conjunction Penalty—from the employee's account. *Id.* And as previously discussed, when employees run out of points, they are subject to progressive discipline and termination. *Id.* at 3. In short, employees who use FMLA leave receive

harsher discipline—and a fast-track to termination—from BNSF compared to employees who don't use FMLA leave. BNSF's Conjunction Penalty violates the FMLA, which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. § 2615(a)(1). Such unlawful interference covers not only the denial of FMLA leave but also "discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). Employers also unlawfully interfere with employees' FMLA rights when they "use the taking of FMLA leave as a negative factor in employment actions, such as…disciplinary actions." *Id.* § 825.220(c). The FMLA expressly forbids "count[ing]" "FMLA leave" "under no fault attendance policies." *Id.* BNSF, through its Conjunction Penalty, unlawfully interferes with its employees' FMLA rights.

33. *Third,* BNSF penalizes, disciplines, and terminates employees who use FMLA through "Good Attendance Credits." Under BNSF's Hi-Viz rules, employees who go 18 consecutive days without marking off from work receive four points in their bank of points. *Id.* at 2. BNSF doesn't even require perfect attendance; marking off for training, company business, a death in the family, jury duty, or military service, among others, does not disqualify employees from receiving Good Attendance Credits. *Id.* But marking off for FMLA leave is another story. Under BNSF's Hi-Viz rules, marking off for FMLA leave disqualifies employees from receiving Good Attendance Credits. *Id.* Much like the Conjunction Penalty, Good Attendance Credits directly punish employees who rely on the

FMLA. Without the ability to earn back points, employees who use FMLA leave find themselves running out of points—and thus facing discipline and termination—much more swiftly than employees who don't use FMLA leave. BNSF's Good Attendance Credits therefore "interfere with…the exercise of…right[s] provided [by the FMLA]." 29 U.S.C. § 2615(a)(1). They "discourage[e]…employee[s] from using such leave." 29 C.F.R. § 825.220(b). They "use the taking of FMLA leave as a negative factor in employment actions," including "disciplinary actions." *Id.* § 825.220(c). And they "count[]" "FMLA leave" "under no fault attendance policies." *Id.* BNSF, through its Good Attendance Credits, unlawfully interferes with its employees' FMLA rights.

34. *Fourth*, BNSF penalizes, disciplines, and terminates employees who use FMLA through the combined effect of Hi-Viz violations and other violations. BNSF does this through its rules for progressive discipline. BNSF generally classifies violations of company rules into three categories: standard, serious, and stand-alone dismissible. Exhibit C. For standard violations, in any given 12-month period, a first violation results in a reprimand, the second, third, and fourth violations result in escalating suspensions, and the fifth violation may result in termination. *Id.* For serious violations, in any given 12-month period, the first violation results in a suspension, and the second violation may result in termination. *Id.* Under BNSF's rules, a Hi-Viz violation occurs when an employee exhausts all of his points. Exhibit A at 3. And as previously discussed, the first and second Hi-Viz violations result in escalating suspensions, and the third violation may result in termination.

*Id.* But Hi-Viz violations can also be *combined with unrelated violations*. An employee may be dismissed if he has two Hi-Viz violations and one additional serious violation. *Id.* Any combination of five standard violations and Hi-Viz violations in a 12-month period may result in termination. Since many Hi-Viz violations are caused by the interplay of the use of FMLA leave and the other BNSF policies challenged in this suit (for example, employees get Hi-Viz violations when BNSF wrongly deems employees to have exhausted their FMLA leave, imposes a conjunction penalty, or withholds the good attendance credit because of FMLA leave), BNSF's rules allowing for the combination of Hi-Viz violations and other violations singles out employees who use FMLA leave for harsher treatment.

35. *Fifth*, BNSF disqualifies employees who use FMLA leave from eligibility for minimum earnings. Train workers work irregular schedules. Some weeks may require many hours of work, some weeks relatively fewer hours. This is especially true for employees who work on so-called "extra boards"—rotating lists of employees who are called upon to work a wide variety of trains on an as-needed basis. To encourage employees to accept such irregular work, BNSF offers an enticement: in any two-week period, employees are entitled to a sum certain in minimum earnings regardless of the number of hours worked or miles logged. If an employee is assigned enough work to exceed the minimum guarantee, he receives compensation based on his miles and hours. If that same employee is *not* assigned enough work to exceed the minimum guarantee, he receives the minimum guarantee. But here is the catch: under BNSF's policies, employees who use

FMLA leave during any given pay period forfeit the right to the minimum guarantee during that pay period.

36. Collectively, BNSF's policies work together to ensure that employees are allotted fewer hours of annual FMLA leave than they should receive, that any leave employees take is overcounted against that original (and already flawed) allotment, and that employees who use FMLA leave are punished—through diminished opportunities for additional work, forfeiture of minimum earnings guarantees, and discipline and termination under BNSF's attendance policy.

37. BNSF's violations of the FMLA are willful and ongoing. Employees and their union representatives have pointed out the illegalities in BNSF's new calculation methodology. The Department of Labor has found similar policies to be unlawful. *See* 1999 FMLA Ltr., 1999 WL 1002428, at *2 (Jan. 12, 1999) (no-fault attendance policies cannot disfavor employees who take FMLA leave); 2018 FMLA Ltr., 2018 WL 4678694 (Aug. 28, 2018) (same). Courts around the country have invalidated the same sorts of policies challenged here. *See, e.g., Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472, 477-78 (6th Cir. 2019) (holding that withholding a good-attendance credit because of FMLA leave violates the FMLA); *Refuerzo v. Southwest Airlines Co.*, 2022 WL 1501015, at *5-7 (N.D. Cal. May 12, 2022) (same); *Roberson v. Kan. City S. Ry. Co.*, 616 F.Supp.3d 928, 936, 938-39 (W.D. Mo. 2022) (holding that employees were likely to succeed on the merits of claims that a railroad violated the FMLA by (1) undercounting FMLA allotment, (2) overcounting

FMLA depletion, and (3) failing to restore employees to their board position after FMLA leave). An employer willfully breaks the law when, as here, it "deliberately ignore[s] judicial invalidations of plans similar to its own." *EEOC v. Westinghouse Elec. Corp.*, 869 F.2d 696, 712 (3d Cir. 1989). Yet BNSF refuses to change course. BNSF persists in its unlawful ways because it has a strong financial incentive to miscalculate employees' FMLA leave and get rid of employees who use FMLA leave.

38. The human costs of BNSF's misconduct, however, are incalculable. BNSF has shortchanged employees needing urgent medical care; parents seeking to care for their children; husbands trying to take care of seriously ailing spouses; and employees who now must work in excruciating pain or risk losing their livelihoods.

39. This is not what Congress had in mind when it granted workers up to 12 weeks of protected medical and family leave and forbid employer to interfere with that leave. Plaintiffs ask this Court to grant all appropriate relief to remedy BNSF's unlawful conduct.

**BNSF'S EMPLOYEES RELY ON THE FMLA**

40. BNSF employs thousands of people, many of whom rely on the FMLA. The Plaintiffs in this case are no exception.

41. When he was employed at BNSF, Plaintiff Josh Vandermeulen used FMLA leave for his daughter's serious medical condition.

42. Plaintiff Jon Caraway uses FMLA leave to care for his children with chronic medical conditions.

43. Plaintiffs are broadly representative of BNSF's employees. These employees (including class members) rely on the FMLA to address serious and important medical- and family-care issues.

**PLAINTIFFS AND SIMILARLY SITUATED EMPLOYEES SUFFER ADVERSE CONSEQUENCES BECAUSE OF BNSF'S UNLAWFUL CONDUCT**

44. Plaintiffs and class members have been adversely affected by these policies. BNSF has miscalculated Plaintiffs' FMLA leave, wrongly deemed Plaintiffs to have exhausted their FMLA leave when they in fact had used less than their 12 weeks allocated by law. BNSF's breach has caused Plaintiffs harm, prohibiting them from taking care of their family members. Plaintiffs have been assessed negative points under the Hi-Viz policy because of the Good Attendance Credit and the Conjunction Penalty. They have received suspensions under the Hi-Viz policy. Plaintiffs have been forced to the bottom of their work boards after taking FMLA leave. And they have lost earnings by forfeiting their minimum compensation guarantee because of taking FMLA leave. Plaintiff Vandermeulen was terminated because of the combination of Hi-Viz violations (that violate the FMLA) and unrelated violations. Other similarly situated class members have been similarly harmed, including through suspensions and terminations.

## CLASS ALLEGATIONS

45. Plaintiffs bring FMLA claims against BNSF pursuant to Federal Rule of Civil Procedure 23, seeking injunctive, declaratory, and other equitable relief, along with back

pay and other monetary and compensatory relief, on behalf of themselves and the following class:

> Current, future, and former BNSF employees who have worked enough hours to be eligible for FMLA or CFRA leave who, at any time from three years preceding the complaint's filing to the resolution of this action, took or attempted to take FMLA or CFRA leave or were the subject of one or more adverse actions because of their use of FMLA or CFRA leave.

Plaintiffs reserve the right to revise this class definition based on discovery or other legal developments.

46. Class treatment is appropriate because the class is so numerous that joinder of all members is impracticable. The exact number within the class is unknown, but it may be determined from records maintained by BNSF.

47. Class treatment is appropriate because there are questions of law or fact common to the class, including the following:

a. whether BNSF's companywide policy or practice of calculating FMLA leave violates the FMLA or CFRA;

b. whether BNSF's companywide policy of moving individuals to the back of the on-call list upon return from FMLA or CFRA leave violates the FMLA or CFRA;

c. whether BNSF's Hi-Viz Conjunction Penalty violates the FMLA or CFRA;

d. whether BNSF's Hi-Viz Good Attendance Credit violates the FMLA or CFRA;

e. whether BNSF's policy of requiring employees to forfeit their minimum compensation guarantee violates the FMLA or CFRA; and

f. whether monetary damages, injunctive relief, and other equitable remedies are warranted.

48. Class treatment is appropriate because BNSF will raise common defenses to the claims.

49. Class treatment is appropriate because Plaintiffs' claims are typical of the class's claims, and Plaintiffs will fairly and adequately protect the class's interests.

50. Class treatment is appropriate because Plaintiffs have retained counsel who are competent, experienced in litigating class actions, and will effectively represent the interests of the class.

51. Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for BNSF and/or would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

52. Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(2) because BNSF has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

53. Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact, including those listed above, predominate over any questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

54. Class treatment is appropriate under Federal Rule of Civil Procedure 23(c)(4) because this is a case in which class adjudication of particular issues would serve the interests of the parties and the Court.

## FIRST CAUSE OF ACTION: FMLA INTERFERENCE/ENTITLEMENT
**(*On behalf of Plaintiffs and the proposed class*)**

55. Congress enacted the FMLA in 1993 to accommodate "the important societal interest in assisting families, by establishing a minimum labor standard for leave." *Churchill v. Star Enters.*, 183 F.3d 184, 192 (3d Cir. 1999) (quoting S.Rep. No. 103-3 at 4, 1993 U.S.S.C.A.N. at 6-7). In enacting the FMLA, Congress sought "(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity; [and] (2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse or parent who has a serious health condition." 29 U.S.C. § 2601(b)(1), (2).

56. To accomplish these goals, the FMLA grants an "eligible employee" the right to 12 workweeks of leave over any 12-month period for, among other things, "the birth of a son or daughter," "a serious health condition that makes the employee unable to perform the

functions" of the employee's position, or the "care [of a] spouse, or a son, daughter, or parent." *Id.* § 2612(a)(1). After a period of qualified leave, an employee is entitled to reinstatement to his former position or an equivalent position with "equivalent employment benefits, pay and other terms and conditions of employment." *Id.* § 2614(a)(1). The taking of FMLA leave, "shall not result in the loss of any employment benefit accrued prior to the date on which leave commenced." *Id.* § 2614(a)(2). Nor can the taking of FMLA leave be used as a negative factor in employment actions. 29 C.F.R. § 825.220(c). In some cases, employees may take a single period of FMLA leave to attend to their or their loved ones' discrete serious medical conditions. *E.g.*, 29 U.S.C. § 2612(a)(1)(A). However, the FMLA also provides for "intermittent" leave, which allows an employee to take FMLA leave intermittently, "when medically necessary," such as to attend appointments with a health care provider for necessary treatment of a serious health condition. *Id.* § 2612(b); 29 C.F.R. § 825.117 (defining requirements for intermittent leave).

57. BNSF is a covered employer under the FMLA, as it engages in commerce or in an industry affecting commerce and employs far more than 50 employees.

58. Plaintiffs and class members are eligible for FMLA leave. At all relevant times, they have been employed by BNSF for at least 12 months, and they worked at least 1,250 hours in each 12-month rolling period that BNSF looks to when calculating leave. They work in an area where BNSF employs 50 or more employees within a 75-mile radius. They and/or

their family members suffer from serious health conditions and other conditions that qualify for leave under the FMLA.

59. The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]." *See* 29 U.S.C. § 2615(a)(1).

60. BNSF violated this provision of the FMLA. It interfered with, restrained, and denied the exercise or attempted exercise of the protected rights of Plaintiffs and the putative class members when it, among other things, miscalculated the amount of FMLA leave they used, could use, or attempted to use; sent them to the bottom of the job boards when they returned from FMLA leave; assessed conjunction penalties because of FMLA leave; denied the good attendance credit because of FMLA leave; caused them to forfeit their minimum compensation guarantee because of the taking of FMLA leave; wrongfully declared that they had exhausted their FMLA leave; charged them with a workplace rule violation and/or assessed negative points for taking or attempting to take FMLA leave or leave that should have been treated as FMLA leave; removed them from service for the supposed violations; and disciplined and/or terminated them for using or attempting to use FMLA leave or leave that should have been treated as FMLA leave. BNSF also interfered with, restrained, and denied the rights or the attempted exercise of the rights of Plaintiffs and putative class members when BNSF refused to let them take leave to which they are entitled under the FMLA. BNSF discouraged employees from taking or attempting to take FMLA leave,

refused to authorize FMLA leave, deterred employees from using FMLA leave, and took other actions to avoid its responsibilities under the FMLA. Plaintiffs and class members have been prejudiced and injured by these violations.

61. BNSF's violations of the FMLA are willful and ongoing.

62. Because BNSF violated the FMLA—and is continuing to violate it—Plaintiffs and the putative class members are entitled to damages for loss of income, including back pay, lost benefits, interest, monetary losses, and front pay, as well as liquidated damages, tax relief, declaratory and injunctive relief, and reinstatement. Plaintiffs and the putative class members are also entitled to attorneys' fees, costs, and interest incurred in connection with these claims.

## SECOND CAUSE OF ACTION: CFRA INTERFERENCE/ENTITLEMENT

**(*On behalf of Plaintiffs and the proposed class*)**

63. The CFRA makes it unlawful for an "employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]." *See* 29 U.S.C. § 2615(a)(1).

64. BNSF violated this provision of the CFRA. It interfered with, restrained, and denied the exercise or attempted exercise of the protected rights of Plaintiffs and the putative class members when it, among other things, miscalculated the amount of CFRA leave they used, could use, or attempted to use; sent them to the bottom of the job boards when they returned from CFRA leave; assessed conjunction penalties because of CFRA leave; denied the good

attendance credit because of CFRA leave; caused them to forfeit their minimum compensation guarantee because of the taking of CFRA leave; wrongfully declared that they had exhausted their CFRA leave; charged them with a workplace rule violation and/or assessed negative points for taking or attempting to take CFRA leave or leave that should have been treated as CFRA leave; removed them from service for the supposed violations; and disciplined and/or terminated them for using or attempting to use CFRA leave or leave that should have been treated as CFRA leave. BNSF also interfered with, restrained, and denied the rights or the attempted exercise of the rights of Plaintiffs and putative class members when BNSF refused to let them take leave to which they are entitled under the CFRA. BNSF discouraged employees from taking or attempting to take CFRA leave, refused to authorize CFRA leave, deterred employees from using CFRA leave, and took other actions to avoid its responsibilities under the CFRA. Plaintiffs and class members have been prejudiced and injured by these violations.

65. BNSF's violations of the CFRA are willful and ongoing.

66. Because BNSF violated the CFRA —and is continuing to violate it—Plaintiffs and the putative class members are entitled to damages for loss of income, including back pay, lost benefits, interest, monetary losses, and front pay, as well as liquidated damages, compensatory and emotional-distress damages, punitive damages, tax relief, declaratory and injunctive relief, and reinstatement. Plaintiffs and the putative class members are also entitled to attorneys' fees, costs, and interest incurred in connection with these claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all class members, pray for relief as follows:

A. Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as the representatives of the Class and Plaintiffs' counsel as Class Counsel;

C. An order expunging any discipline and disciplinary points incurred related to the use of FMLA/CFRA leave or other leave taken that should have been protected FMLA/CFRA leave from Plaintiffs' and the putative class members' work records, reinstating Plaintiffs and putative class members for whom such discipline resulted in termination, requiring BNSF to deem Plaintiffs and class members who were terminated or held out of service as a result of BNSF's unlawful FMLA/CFRA practices to have worked and taken leave at the same rate they did before being terminated so that Plaintiffs and class members remain eligible for FMLA/CFRA leave upon their reinstatement, and requiring BNSF to promote those who were not promoted as a result of its FMLA/CFRA unlawful practices;

D. An order requiring BNSF to pay to Plaintiffs and the putative class members awards for back pay; front pay; wages, salary, employment benefits or other compensation denied or lost; actual monetary losses; compensatory damages; punitive damages; interest; and liquidated damages;

E. An order requiring BNSF to pay to Plaintiffs and the putative class members an award for costs (including litigation and expert costs), disbursements, interest, tax relief, and attorney's fees;

F. An order requiring BNSF to pay all class representatives an incentive fee;

G. An order enjoining BNSF from miscounting FMLA/CFRA leave, interfering with or restraining employees who use FMLA/CFRA leave, or denying

employees' use of or attempt to use FMLA/CFRA leave, and declaring such conduct to be in violation of the FMLA/CFRA;

H. Leave to amend their complaint; and

I. Such other relief, including equitable relief, as may be appropriate or that the Court deems just and proper.

COUNSEL FOR PLAINTIFFS AND CLASS MEMBERS

Date: February 10, 2026

s/ Adam W. Hansen
Adam W. Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401
Email: adam@apollo-law.com
Phone: (612) 927-2969

Nicholas D. Thompson
CASEY JONES LAW
323 N Washington Ave
Ste 200
Minneapolis, MN 55401
Phone: (757) 477-0991
Email: nthompson@caseyjones.law
(*admission pro hac vice forthcoming*)